IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

ARGONAUT INSURANCE COMPANY,      *

         Plaintiff,              *

                                 *

             v.                  *      CIVIL NO.: WDQ-11-2741

                                 *

WOLVERINE CONSTRUCTION, INC.,
et al.,                          *

         Defendants.             *

*    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION

Argonaut Insurance Company ("Argonaut") sued Wolverine

Construction, Inc. ("Wolverine"), Wolverine's President Robert

J. Zimmerman ("Zimmerman"), and various Wolverine affiliates[1] for

contractual indemnity and violation of the Maryland Trust Fund

Statute (the "MTFS"), Md. Code Ann., Real Prop. §§ 9-201, et

seq. Pending are Argonaut's motion for summary judgment and

Zimmerman's cross-motion for summary judgment. For the

following reasons, Argonaut's motion for summary judgment on its

contractual indemnity claim against Wolverine will be granted.

Argonaut's motion for summary judgment on its claim against

_____

[1] Argonaut also sued Wolverine Contractors, Inc. ("Wolverine
Contractors"); Wolverine Management, Inc. ("Wolverine
Management"); Wolverine corporate officer Shaun Zimmerman; and
Elissa H. Dillon. ECF No. 32 ¶¶ 2-7. Shaun Zimmerman and
Dillon have since been dismissed from the case. See ECF Nos.
39, 58.

Zimmerman for violation of the MTFS will be denied.  Zimmerman's cross-motion for summary judgment will be denied.

I.  Background[2]

A. Factual Background

In 2006, Wolverine was incorporated in Maryland.  Argonaut Mot. for Summ. J. [hereinafter, "Argonaut Mot."], Ex. H (Zimmerman Dep.) 19:6-19; ECF No. 32 ¶ 2.  Wolverine, Wolverine Contractors, and Wolverine Management are all incorporated in Maryland and have their principal places of business in Pikesville, Maryland.  ECF No. 1 ¶¶ 2-4.  Argonaut is incorporated in Illinois and has its principal place of business in San Antonio, Texas.  ECF No. 1 ¶ 1.  Under Wolverine's articles of incorporation, Robert Zimmerman owned 50% of the company; the other 50% was owned by Douglas Dillon and Dillon's wife Elissa.  Zimmerman Dep. 24:6 to 25:18.  Robert Zimmerman and Elissa Dillon are also Maryland citizens.  ECF No. 1 ¶¶ 5-6.  Although the record is unclear, it appears that Robert Zimmerman was, at various times between 2006 and 2010, Wolverine's "secretary treasurer," corporate secretary, and vice president.  *See id.* 16:5 to 17:2; 26:13-19; 27:16-20; 28:1-14.  In 2007, Robert Zimmerman hired his son, Shaun Zimmerman, as a laborer;

---

[2] On cross-motions for summary judgment, "each motion [is] considered individually, and the facts relevant to each [are] viewed in the light most favorable to the non-movant."  *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

in 2008, Shaun was promoted to a supervisory position and ultimately to the position of corporate secretary. *Id.* 20:16-20; 30:17 to 31:20; 32:19-21.

On June 23, 2009, Evangel Cathedral, Inc. ("Evangel Cathedral") executed a construction contract ("the Contract") with Wolverine, in which Wolverine agreed to construct the Evangel Chapel project located at 13901 Central Avenue, Upper Marlboro, Maryland (the "Project"). Argonaut Mot., Ex. A; *see id.*, Ex. B Miseo[3] Aff. ¶ 5. Accounting firm Zimmerman & Associates, LLC ("Z&A")--of which Robert Zimmerman had been an owner and the managing member from 1976 to 2006[4]--prepared financial statements for Wolverine in connection with the Project. *Id.*, Ex. F.[5] Between October 2009 and October 2010, Robert Zimmerman signed several engagement letters between Wolverine and Z&A on behalf of Wolverine. *See id.*, Ex. G.

---

[3] "Miseo" is Vincent C. Miseo, Assistant Vice President, Senior Surety Counsel, and Director of Claims for Argonaut. Miseo Aff. ¶ 2.

[4] *See* Argonaut Mot., Ex. E (Zimmerman's Resps. to Reqs. for Admis.) Nos. 17-18, 20. Zimmerman is a certified public accountant with over 30 years of accounting experience. *Id.*, Nos. 3, 6-8. After selling his ownership interest in Z&A in 2006, Zimmerman continued to be paid as a consultant for the firm. *Id.*, Nos. 26-28; Zimmerman Dep. 13:15-21.

[5] While Zimmerman was its managing member, Z&A "specialized" in providing accounting services to construction companies. Zimmerman's Resps. to Reqs. for Admis., No. 24.

Argonaut, as surety, issued payment and performance bonds
(the "Bonds")--effective December 7, 2009--for the Project.
Argonaut Mot., Ex. C. The Bonds named Wolverine as Contractor
and Evangel Cathedral as Owner. *Id.* In exchange for Argonaut's
agreement to issue the bonds on Wolverine's behalf, Wolverine,
Wolverine Contractors, and Wolverine Management ("collectively,
the "Indemnitors") executed a General Indemnity Agreement (the
"Agreement"), promising:

> [t]o indemnify, hold harmless[,] and exonerate
> [Argonaut] from and against any and all Loss, as well
> as any other reasonable expense that [Argonaut] may
> incur or sustain as a result of or in connection with
> the furnishing, execution, renewal, continuation, or
> substitution of any Bond(s). Expenses include, but
> are not limited to: (a) the cost incurred by reason of
> making an independent investigation in connection with
> Bond(s) or this Agreement; (b) the cost of procuring
> or attempting to procure [Argonaut's] release from
> liability or a settlement under any Bond(s), including
> the defense of any action brought in connection
> therewith; and (c) the cost incurred in bringing suit
> to enforce this Agreement against any of the
> Indemnitors. Payments of amounts due [Argonaut]
> hereunder, including interest, shall be made
> immediately upon [Argonaut's] demand. Vouchers,
> affidavits, or other evidence of payment by [Argonaut]
> shall be prima facie evidence of the Indemnitors'
> liability for any such Losses or other expenses.

*Id.,* Ex. D ¶ 2.

The Agreement also contained a default provision, which
provided that,

> [t]he Indemnitors shall be in default of this
> Agreement if: (a) Indemnitors become involved in any
> insolvency, receivership, liquidation, or bankruptcy;
> (b) Indemnitors make representation to [Argonaut] by

4

or on behalf of any of the Indemnitors that prove to have been misleading or materially false when made; *(c) Indemnitors fail to provide collateral in response to a proper request made by [Argonaut];* (d) Indemnitors breach any other provision of this Agreement; (e) [Argonaut] establishes reserves in connection with any Bond(s); *and/or (f) [Argonaut] sustains Losses under Bond(s).*

*Id.*, Ex. D ¶ 8 (emphases added). Finally, the Agreement described when Argonaut would be entitled to a release from liability or, alternatively, to demand collateral from the Indemnitors:

**Surety's Rights to Release of Bonds and Indemnitors[']** **Waiver**. [Argonaut] may, in its sole and absolute discretion, determine one or more of the following: (a) the Indemnitors['] financial condition has been or may be deteriorating; or (b) there has been or may be some other change that adversely impacts [Argonaut's] risk under the Bond(s). In such an event, within thirty (30) days of receipt of [Argonaut's] written demand, the Indemnitors shall procure the full and complete release of the Bond(s) by providing competent written evidence of release satisfactory to [Argonaut], in [Argonaut's] sole discretion. If Indemnitors fail to provide the aforementioned release[,] Indemnitors shall, within an additional seven (7) days, provide [Argonaut] with collateral in the amount of 100% of all unreleased liability under the Bond(s). The liability shall be determined at the time of [Argonaut's] written demand.

*Id.*, Ex. D ¶ 10 (bold emphasis in original). Robert Zimmerman signed the Agreement as Wolverine's corporate secretary. *See generally id.*; Zimmerman Dep. 26:9-19.

From July 2009 to October 2010, while the Project was underway, Robert Zimmerman signed over 600 checks from Wolverine's operating bank account, authorizing the release of

5

over $2.13 million in Wolverine's funds to third parties and related parties. Argonaut Mot., Ex. L ¶¶ 1-10, 31-32. During 2010, Wolverine changed banks and Zimmerman was no longer an authorized signator for Wolverine. Zimmerman Dep. 79-80. However, in late July 2010 after Douglas Dillon's death, Zimmerman participated in weekly meetings regarding which subcontractors and suppliers were paid by Wolverine. *Id.* at 108.

Evangel Cathedral paid Wolverine a total of $3,883,026.08 in Contract funds for the Project; however, Wolverine paid only $2,762,422.45 to the Project subcontractors and suppliers. Argonaut Mot., Ex. L ¶¶ 11-19. Thus, Wolverine received $1,120,603.63 more from Evangel Cathedral than what it paid to subcontractors and suppliers for the Project. *Id.* ¶ 14. During the Project, Wolverine made payments to its own employees and various other individuals or entities.[6] These payments also included $23,000 to D&D Construction, a subcontractor solely owned by Zimmerman; and $149,500 to Z&A Realty, the owner of the building where Wolverine's office is located, which is also one-third owned by Zimmerman. *Id.* ¶¶ 29, 27. Zimmerman signed many of the checks authorizing these payments. *Id.* ¶¶ 24-30.

---

[6] *See* Argonaut Mot., Ex. L ¶¶ 24-26, 30. These payments included approximately $741,000 to Wolverine's own employees for payroll, $11,000 to Zimmerman, $17,590 to Shaun Zimmerman, $68,787.50 to Zimmerman & Associates, LLC, and $16,210 to the Baltimore Orioles. *Id.*

Wolverine also made "four significant loans" to other Wolverine entities. *Id.* ¶ 28.

On February 14, 2011, Evangel Cathedral declared default under the Contract and asserted that Wolverine failed to pay its subcontractors and suppliers, failed to substantially complete the Project, and that Wolverine was responsible for liquidated damages. Argonaut Mot., Exs. N, E. By a February 14, 2011 letter, Evangel Cathedral told Zimmerman that it would pursue its rights against him based on construction trust funds that were not properly paid to subcontractors and suppliers. *Id.*, Ex. O. Zimmerman met repeatedly with the head of Evangel Cathedral, Bishop Dan Meares, on behalf of Wolverine to negotiate a deal to complete the Project and receive the remaining money on the Contract. Zimmerman Dep. 164-69. Evangel Cathedral refused all attempts to negotiate a deal with Wolverine. *Id.*[7]

Wolverine's subcontractors and suppliers made claims against Argonaut's Bonds for Wolverine's non-payment of their work on the Project. Argonaut Mot., Ex. B ¶ 6. In a March 16, 2011 letter, Argonaut demanded that Wolverine hold harmless and exonerate Argonaut for any losses it may incur as a consequence of issuing the Bonds. *Id.* at ¶ 7. The letter also demanded

---

[7] Zimmerman referred to Meares as "unreasonable" and "impossible" based on his failed negotiation attempts. *Id.*

that Wolverine either provide Argonaut with a full and complete release of the Bonds or to provide Argonaut with collateral. *Id.* Wolverine breached the Agreement by failing to provide a full release of the Bonds or to post collateral. *Id.* Argonaut investigated the claims that subcontractors and suppliers had made against the Bonds. *Id.* at ¶ 9. Wolverine told Argonaut that the amounts were due and owing and provided Argonaut with statements of account regarding the claims. *See* Argonaut Mot., Ex. Q. Argonaut has made payments to Wolverine's subcontractors and suppliers totaling $758,003.40. *See* Argonaut Mot., Ex. B ¶ 10; Ex. T.[8] Argonaut also requested that Evangel Cathedral release the remaining moneys on the Contract. *Id.*, Ex. B. ¶ 11.

---

[8] Argonaut has made the following payments to Wolverine's subcontractors and suppliers:

Bowing Huber LLC d/b/a/ BoMark Electric ($19,461.88);
Concrete Enterprises, Inc. ($19,000.74);
Crane Service Co., Inc. ($6,056.99);
Diamond Waste Services, Inc. ($1,554.65);
EAD Mechanical ($21,480.37);
Eagle Construction ($6,094.00);
Glass Tech, LLC d/b/a EDCO Glass Systems ($79,855.05);
Hayles & Howe, Inc. ($93,272.01);
Interlock Paving, Inc. ($41,523.50);
L.P. Heating & Air Conditioning ($50,037.80);
Locust Lane Farms ($39,305.23);
Maryland Iron, Inc. ($40,001.94);
Rowehouse ($2,140.00);
Sierra Commercial Construction, Inc. ($122,441.90);
South County Contractors ($21,090.00);
Sunbelt Rentals, Inc. ($3,447.34);
Turner Roofing ($14,240.00).

Argonaut Mot., Ex. T.

Evangel Cathedral asserted that it was entitled to liquidated damages based on Wolverine's delay in completing the Project.[9] After negotiations, Evangel Cathedral paid $237,191 to Argonaut. Argonaut Mot., Ex. R ¶¶ 9-15.

Argonaut asserts a contractual indemnity claim against Wolverine for the principle damage amount of $520,812.40.[10] Under the Agreement, Argonaut also seeks recovery of all attorneys' and consultants' fees and expenses incurred investigating claims and enforcing the terms of the Agreement, totaling $148,886.76. Argonaut Mot. ¶ 50. Argonaut also seeks $506,505.85 from Zimmerman for violation of the MTFS. *Id.* ¶ 51.

B. Procedural History

On September 23, 2011, Argonaut sued Wolverine, Wolverine Contractors, Wolverine Management, Robert Zimmerman, and Elissa Dillon based on diversity jurisdiction.[11] ECF No. 1. Wolverine, Zimmerman, and Dillon answered the complaint. ECF Nos. 10, 11.

_____

[9] Evangel Cathedral originally asserted that it was entitled to over $200,000 in liquidated damages based on the delay in the completion of the Project. The Contract provided for a daily rate of $1,000 in liquidated damages. The Contract specified that all work was to be substantially completed by October 21, 2010, and the work was not completed until June 27, 2011. Argonaut Mot., Ex. R ¶¶ 14-15.

[10] Argonaut reached this figure by taking the total amount of claim payments made ($758,003.40) minus the amount released by Evangel Cathedral ($237,191). *See* Argonaut Mot. ¶ 49.

[11] Because there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, this Court has jurisdiction. *See* 28 U.S.C. § 1132(a).

On February 21, 2012, Argonaut moved for a Clerk's entry of default against Wolverine Contractors and Wolverine Management, which was granted on March 6, 2012. ECF Nos. 17, 20.

On May 18, 2012, the Court granted Argonaut's motion for leave to amend the complaint to add Shaun Zimmerman as a defendant and to reduce its principal demand amount. *See* ECF Nos. 25, 31. Also on May 18, the amended complaint was filed, ECF No. 32,[12] and the Clerk issued a summons to Shaun Zimmerman, ECF No. 34.

On September 14, 2012, Argonaut moved for summary judgment. ECF No. 38.[13] On September 27, 2012, Argonaut, Wolverine, Robert Zimmerman, and Dillon stipulated to the dismissal, with prejudice, of Argonaut's claims against Dillon. ECF No. 39. The stipulation was approved on September 28, 2012. ECF No. 41.

---

[12] The amended complaint pled two causes of action: (1) contractual indemnity (against Wolverine, Wolverine Contractors, Wolverine Management, and Dillon); and (2) violation of the MTFS (against Robert and Shaun Zimmerman). ECF No. 32 at 8-10.

[13] According to its motion for summary judgment, Argonaut seeks judgment against Wolverine, Wolverine Contractors, Inc., Wolverine Management, Inc., and Robert Zimmerman. ECF No. 38 at 1. However, in the memorandum in support of its motion, Argonaut states that the motion seeks judgment against Wolverine and Zimmerman alone. ECF No. 38-2 at 1.

Wolverine Contractors and Wolverine Management have been unresponsive in these proceedings. On February 21, 2012, Argonaut moved for entry of default. ECF No. 17. On March 6, 2012, the clerk ordered entry of default against Wolverine Contractors and Wolverine Management. ECF No. 20. To the extent Argonaut seeks judgment against Wolverine Contractors and Wolverine Management, Argonaut should move for default judgment.

On October 16, 2012, Wolverine and Robert Zimmerman separately opposed Argonaut's motion for summary judgment. ECF Nos. 47, 48. Also on October 16, Robert Zimmerman cross-moved for summary judgment on Count Two. ECF No. 49. On October 19, 2012, Robert Zimmerman supplemented his opposition to Argonaut's motion and his cross-motion for summary judgment. ECF Nos. 50, 51. On November 9, 2012, Argonaut opposed Robert Zimmerman's cross-motion for summary judgment, and separately replied in support of its motion. ECF Nos. 54, 55.[14]

On August 16, 2013, Argonaut voluntarily dismissed its claims against Shaun Zimmerman. ECF No. 57. The Court approved the dismissal on August 16, 2013. ECF No. 58.

II. Analysis

A. Legal Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[15] In considering the motion, the judge's function is "not . . . to weigh the evidence and determine the truth of

---

[14] As the above procedural history demonstrates, neither Argonaut nor Zimmerman complied with Local Rule 105.2(c) in briefing their cross-motions. Local Rule 105.2(c) (D. Md. 2011).

[15] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

When cross-motions for summary judgment are filed, "each motion must be considered individually, and the facts relevant to each must be reviewed in the light most favorable to the nonmovant." *Mellen*, 327 F.3d at 363 (*citing Rossignol v. Voohaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

B. Argonaut's Motion for Summary Judgment

1. Contractual Indemnity Claim Against Wolverine

Argonaut asserts that it is entitled to summary judgment because Wolverine is obligated to indemnify Argonaut for the amounts paid to subcontractors and suppliers by Argonaut, and

12

for related fees as provided for by the Agreement. Argonaut Mot. at 14. Wolverine contends that the "appropriate amount for the close-out" of the Project is $200,000. Wolverine's Opp'n to Pl.'s Mot. for Summ. J. [hereinafter Wolverine Opp'n], at 2. Wolverine also argues that Argonaut's claim for legal and accounting fees is unjustified based on Wolverine's cooperation. *Id.* at 3. Additionally, Wolverine asserts that summary judgment is precluded because Wolverine is entitled to a set-off based on damages from Argonaut's failure to continue the bonding relationship in violation of an agreement. *Id.* at 4.

A suretyship contract is an agreement among a principal obligor, an obligee, and a surety. *See Inst. of Mission Helpers of Baltimore City v. Reliance Ins. Co.*, 812 F. Supp. 72, 74 (D. Md. 1992). The surety is responsible if the principal obligor fails to perform. *See Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1309 (Md. 1985). If an express indemnification contract exists, the terms govern the rights and liabilities of the parties and the surety is "entitled to stand upon the letter of his contract." *See Fidelity & Deposit Co. of Md. v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir. 1983) (internal quotation marks omitted). A broad indemnity provision will be upheld absent fraud or lack of good faith. *Id.* In Maryland, the good faith standard requires the surety to act in a reasonable manner in handling or paying claims. *See Atl.*

*Contracting & Material Co., Inc. v. Ulico Cas. Co.*, 844 A.2d
460, 473-74 (Md. 2004).

Here, the indemnification agreement requires Wolverine
"[t]o indemnify, hold harmless and exonerate [Argonaut] from and
against any and all Loss, as well as any other reasonable
expense that [Argonaut] may incur or sustain as a result of or
in connection with the furnishing, execution, renewal,
continuation, or substitution of any Bond[s]." Argonaut Mot.,
Ex. D. The term "Loss" includes "all sums . . . paid by
[Argonaut] to claimants under the Bonds." *Id.* Argonaut made
payments to Wolverine's subcontractors and suppliers for claims
under the Bond totaling $758,003.40 for the Project. Argonaut
Mot., Ex. T. These payments are within the definition of
"Loss," and therefore Wolverine is obligated under the agreement
to indemnify Argonaut for these payments. [16]

The amounts paid by Argonaut were due and owing from
Wolverine and Wolverine has not disputed the validity of these
claims or payments. *See* Argonaut Mot., Ex. Q; Wolverine Opp'n
at 8.[17] Instead, Wolverine argues that the amount ultimately

---

[16] *See Cincinnati Ins. Co. v. Am. Glass Indus.*, No. 1:07CV1133
(JCC), 2008 WL 4642228, at *3-4 (E.D. Va. Oct. 15, 2008)
(finding the principal obligor and indemnitors liable under
similar indemnity agreement language for the surety's payments
made under the bonds).

[17] Wolverine's attached payment breakdown concedes that Argonaut
made payments of $740,345.06 to subcontractors and suppliers

14

owed to Argonaut should be reduced because "additional monies
could have been received from the owner as a result of
additional services performed." Wolverine Opp'n, Zimmerman Aff.
¶ 3. Argonaut made a good faith effort to negotiate the
collection of remaining contract funds from Evangel Cathedral.[18]
After negotiations, Evangel Cathedral paid Argonaut $237,191 to
resolve the claim for the remaining contract money. Argonaut
Mot., Ex. R ¶¶ 14-15. Wolverine has provided no evidence of
entitlement to additional contract money from Evangel Cathedral
or that more money could have been negotiated.[19]

Wolverine's only evidence for its $200,000 figure is
Zimmerman's statement that "[m]y best estimate, had Wolverine

owed by Wolverine. *See* Wolverine Opp'n at 8. For the remaining
two payments claimed by Argonaut (Sunbelt Rentals, Inc. for
$3,447.34 and Turner Roofing for $14,240.00), Argonaut Mot., Ex.
T, Wolverine admits to owing at least those amounts. *See*
Wolverine Opp'n at 8. Argonaut has provided undisputed evidence
that the two payments were made on January 13, 2012 and July 18,
2012 respectively. Argonaut Mot., Ex. T.

[18] Evangel Cathedral originally asserted that it was entitled to
over $200,000 in liquidated damages because the Project was not
completed until June 27, 2011, 249 days after the October 21,
2010 contractually mandated date for substantial completion.
*See* Argonaut Mot., Ex. R. Argonaut negotiated with Evangel
Cathedral and reduced the liquidated damage amount to $137,000.
*Id.*

[19] Wolverine did not address the issue of the liquidated damages
owed Evangel Cathedral in its opposition to Argonaut's motion
for summary judgment. Wolverine had been repeatedly
unsuccessful in negotiating with Evangel Cathedral to release
additional contract money. *See* Argonaut Mot., Ex. H, Zimmerman
Aff. 164-169.

been given the opportunity to negotiate with either the sub-contractors and with the owner, the loss to Argonaut would have been $200,000.00, and it is my belief this is the appropriate 'close out' number for this project." Wolverine Opp'n, Zimmerman Aff. ¶ 3. Unsupported speculation is not sufficient to defeat a motion for summary judgment. *See Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986). Accordingly, Argonaut acted in an objectively reasonable manner in settling Wolverine's claims and is entitled to indemnification.

Additionally, Wolverine asserts that it is entitled to a set-off of the amount owed because Argonaut damaged Wolverine "by failing to continue the bonding relationship notwithstanding its agreement to do so." Wolverine Opp'n at 4. Argonaut contends that no agreement existed. Argonaut Reply at 6. Wolverine's only evidence of the purported agreement is Zimmerman's affidavit statement that "Argonaut reneged on its agreement to continue bonding Wolverine Construction, Inc. causing the company to fail." *See* Wolverine Opp'n, Zimmerman Aff. ¶ 7. This vague and unsupported conclusion is insufficient to create a genuine issue of material fact.[20] Argonaut further

---

[20] *See Brown v. Flowers*, 196 Fed. App'x 178, 182 (4th Cir. 2006) (holding an affidavit with a vague assertion not otherwise supported by evidence in the record or by other proof insufficient to create genuine issue of material fact).

argues that the terms of the Agreement preclude any "offset" based on the alleged agreement. Argonaut Reply at 6. The Surety Agreement provides that "[t]he obligations of the Indemnitors under this Agreement shall not be impaired by and [Argonaut] shall incur no liability on account of . . . [Argonaut's] failure or refusal to furnish Bond(s)." Argonaut Mot., Ex. D ¶ 5. The Agreement also requires that all changes must be in signed writing. *Id.* ¶ 16. Finally, the Agreement states that "THERE ARE NO OTHER AGREEMENTS OR UNDERSTANDING WHICH IN ANY WAY LESSEN OR MODIFY THE OBLIGATIONS SET FORTH HEREIN." *Id.* ¶ 26. Therefore, even assuming the existence of an agreement for Argonaut to issue additional bonds to Wolverine, Argonaut has provided undisputed evidence that the indemnification obligations would not have been affected. Because there is no genuine issue of material fact regarding whether Wolverine is entitled to an offset, summary judgment is not precluded on this basis.

Wolverine further asserts that Argonaut's claim for legal and accounting fees is "totally unjustified" because Wolverine cooperated with Argonaut and litigation was unnecessary. *See* Wolverine Opp'n at 3. Argonaut contends that under the Agreement, it is entitled to all fees it incurred investigating claims and bringing suit to enforce the Agreement. Argonaut Reply at 8. In Maryland, a contractual obligation to pay legal

fees is generally valid and enforceable. *Atl. Contracting*, 844
A.2d at 477-78. "Indemnity agreements of this kind are
interpreted generally to entitle the surety to recover fees,
costs, and expenses incurred in enforcing them." *Id.* at 478.
The Court must evaluate the reasonableness of the fees, even in
the absence of a contractual provision requiring reasonableness.
*See Rauch v. McCall*, 761 A.2d 76, 84-85 (Md. 2000).

Here, the Agreement provides a broad definition of the term
"Loss" which includes "all costs and expenses incurred in
connection with investigating, paying or litigating any claim."
Argonaut Mot., Ex. D.[21] Under this provision, Wolverine is
obligated by contract to pay Argonaut the sums it incurred in

---

[21] The Agreement's full definition of "Loss" includes:

> [A]ny and all sums (a.) *paid by Surety to claimants
> under the Bonds*, (b.) sums required to be paid by
> claimants by Surety but not yet, in fact, paid by
> Surety, by reason of execution of such Bonds, (c.) *all
> costs and expenses incurred in connection with
> investigating, paying, or litigating any claim,
> including but not limited to legal fees and expenses,
> technical and expert witness fees and expenses* and
> (d.) *all costs and expenses incurred in connection
> with enforcing the obligations of the Indemnitors
> under this Agreement including, but not limited to
> legal fees and expenses* and (e.) all accrued and
> unpaid premiums owing to Surety for the issuance,
> continuation or renewal of any Bonds or for any policy
> of insurance issued by Indemnitors and (f.) all other
> amounts payable to Surety according to the terms and
> conditions of this Agreement.

Argonaut Mot., Ex. D. (emphases added).

investigating the claims and enforcing the agreement.[22] Argonaut has the burden of establishing the reasonableness of the requested rate of attorney's fees. *See Robinson v. Equifax Info. Servs., LLC*, 560 F.2d 235, 244 (4th Cir. 2009). Argonaut has provided a detailed accounting of the fees incurred from reviewing numerous claims and seeking enforcement of the agreement, including the evidence regarding the reasonableness of attorneys' and consultants' fees. *See* Argonaut Mot., Ex. B, Ex. U. The attorneys' fees requested are a reasonable hourly rate under the Local Rules.[23]

Argonaut must also establish the reasonableness of the hours requested. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). When the documentation of hours is vague or incomplete the district court may reduce the award accordingly. *See CoStar Grp., Inc. v. LoopNet, Inc.*, 106 F. Supp. 2d 780, 788-89 (D. Md. 2000). Wolverine does not specifically challenge either the

---

[22] *See Fidelity & Deposit Co. of Maryland*, 722 F.2d at 1166; *Atl. Contracting*, 844 A.2d at 478.

[23] Two attorneys from the firm Pike & Gilliss, LLC provided legal services for Argonaut in this controversy. Argonaut Mot., Ex. U. Eric G. Korphage was admitted to the bar in 2001 and charged an hourly rate of $225. *Id.* David D. Gilliss was admitted to the bar in 1985 and charged an hourly rate of $250. *Id.* Both of these rates are presumptively reasonable under the Local Rules. *See* D. Md. Local Rules, Appx. B.3. The Local Rules provide a reasonable range of $225 to $300 for lawyers admitted to the bar for nine to fourteen years, such as Korphage, and a range of $225 to $400 for those admitted to the bar for fifteen years or more, such as Gilliss. See *id.*

rate or the hours of the requested attorneys' fees as
unreasonable; instead, Wolverine makes a blanket objection that
it "should not be liable for the extraordinary and unnecessary
litigation expenses." *See* Wolverine Opp'n at 3. "[T]he Court
will not review any challenged entry in the bill unless the
challenging party has identified it specifically and given an
adequate explanation for the basis of the challenge." *Thompson
v. U.S. Dep't of Housing & Urban Dev.*, No. MGJ-95-309, 2002 WL
3177631, at *10 (D. Md. Nov. 21, 2002). Because Wolverine has
not specifically challenged any requested fee entries and
Argonaut has provided detailed records specifying the services
performed, no reduction in attorneys' fees is necessary.

Additionally, Wolverine's assertion that litigation was
unnecessary to enforce the Agreement is refuted by Wolverine's
denial of the alleged damages and its continued efforts to fight
Argonaut's claim. *See* Wolverine Answer. Accordingly,
Argonaut's consultant, attorney, and related fees are properly
recoverable under the Agreement. Because there is no genuine
dispute of fact regarding the amount of claims payments made by
Argonaut or the enforceability of the Agreement, Argonaut is
entitled to summary judgment in its contract indemnity claim
against Wolverine.

2. Maryland Construction Trust Statute Claim Against

   Zimmerman

Argonaut asserts that it is entitled to summary judgment
because Zimmerman violated the statute as an officer of
Wolverine by improperly using the trust funds paid by Evangel
Cathedral for work done on the Project. Argonaut Mot. at 20.
Zimmerman first contends that summary judgment is not
appropriate because he did not "knowingly" retain or use money
held in trust for other purposes. Zimmerman Opp'n to Pl.'s Mot.
Summ. J. [hereinafter "Zimmerman Opp'n"] at 4.

Under the MTFS, upon receiving funds from an owner, a
contractor must hold the funds in trust for the benefit of the
subcontractor that preformed the work. *See Ferguson Trenching
Co., Inc. v. Kiehne*, 618 A.2d 735, 737-38 (Md. 1993). The MTFS
imposes personal liability on an officer of a contractor who
fraudulently uses the funds by providing that:

> Any officer, director, or managing agent of any
> contractor or subcontractor, who knowingly retains or
> uses the moneys held in trust under § 9-201 of this
> subtitle, or any part thereof, for any purpose other
> than to pay those subcontractors for whom the moneys
> are held in trust, shall be personally liable to any
> person damaged by the action.

Md. Code Ann., Real Prop. § 9-202. Liability is not imposed
based on "the mere insufficiency of funds to pay all down-the-
chain subcontractors or suppliers." *Selby v. Williams Constr.
Servs.*, 948 A.2d 132, 139 (Md. Ct. Spec. App. 2008). Instead,

21

an officer is personally liable when "funds paid by contractors to subcontractors are earmarked for payment to a specific payee, but payment is not made, and those funds can be tracked." *Id.* An officer with actual knowledge of the company's money flow can be held personally liable.[24]  Knowledge can also include the willful refusal to know. *See Ferguson Trenching*, 618 A.2d at 743 (*citing Owens-Illinois v. Zenobia*, 601 A.2d 633, 654 n.23 (Md. 1992)).

A reasonable jury could find that Zimmerman did not knowingly use money held in trust for purposes other than to pay subcontractors.[25]  Zimmerman alleges that he relied on Doug Dillon's approval of payments for any checks signed in 2009 through the first half of 2010, and that Dillon "ran everything 100 [percent]." Zimmerman Opp'n at 5. Zimmerman's argument that he did not knowingly use trust funds is supported by the testimony of Jackie Conn, a long-time employee of Wolverine. *Id.* at 7, 8. Jackie Conn testified that Dillon decided which

---

[24] *See In re McGee*, 258 B.R. 139, 149 (Bankr. D. Md. 2001); *Walter v. Atl. Builders Grp., Inc.*, 951 A.2d 94, 105 (Md. Ct. Spec. App. 2008).

[25] *Compare Walter,* 951 A.2d at 105 (Md. Ct. Spec. App. 2008) (finding officer with control over money disbursements had actual knowledge of money flow when specific funds were received for subcontractors, but not paid to them), *with Selby*, 948 A.2d at 138-39 (Md. Ct. Spec. App. 2008) (finding officer not personally liable when funds were not earmarked for payment to subcontractors and were not diverted from payment by the officer).

subcontractors or suppliers were to be paid, Zimmerman did not take part in the payment process, and Zimmerman never determined who would get paid. *Id.* As a result, there is a genuine dispute about whether Zimmerman had the requisite knowledge for personal liability under the MTFS. Accordingly, Argonaut's motion for summary judgment on this claim must be denied.[26]

C. Robert Zimmerman's Cross-Motion for Summary Judgment

Zimmerman first asserts that he is entitled to summary judgment because Argonaut has not shown that funds were misappropriated; and alternatively, that Zimmerman did not knowingly retain or use moneys held in trust. Zimmerman Mot. for Summ. J. [hereinafter, "Zimmerman Mot."], at 7. Argonaut contends that Zimmerman is not entitled to summary judgment on this basis because there is "an abundance of evidence" that Zimmerman knowingly violated the MTFS by misusing funds. Argonaut Resp. in Opp'n to Zimmerman Mot. for Summ. J. [hereinafter Argonaut Resp.], at 11.

An officer, director, or managing agent of a general contractor "who knowingly retains or uses the moneys held in trust . . . for any purpose other than to pay those subcontractors for whom the moneys are held in trust" is personally liable. Md. Code Ann., Real Prop. § 9-202. Funds

---

[26] Because summary judgment is precluded on this basis, the Court will not address Zimmerman's alternative arguments in opposition to Argonaut's motion for summary judgment.

23

paid to a contractor for the payment of claims of subcontractors or suppliers are subject to the statute. *See In re McGee*, 258 B.R. 139 at 148. "Specific funds need not be traced by the claimants in order to enforce the trust and to recover for its violation." *Id.* Funds that are earmarked or segregated for payment, and then diverted for other purposes impose personal liability under the statute. *See Selby*, 948 A.2d at 138-139.

Evangel Cathedral paid Wolverine based on payment applications with specific itemizations of the type of work done and its cost. *See* Argonaut Resp., Ex. E (showing payment applications with itemized billing, such as "Asphalt Paving" and "Sprinkler"). Because Evangel Cathedral paid Wolverine for specific work done by subcontractors, the payments were subject to the statute.[27] Argonaut demonstrated that some funds paid by Evangel Cathedral to Wolverine for specific work were not utilized by Wolverine to pay the subcontractors which performed the work. *See* Argonaut Mot., Ex. L. Argonaut is not required to specifically trace the trust funds; instead, it is enough that Argonaut has demonstrated that the trust fund money did not go to the required subcontractors or suppliers. *See In re McGee*, 258 B.R. at 148-19.

---

[27] *Compare In re Mcgee*, 258 B.R. at 148 (finding liability when funds earmarked for payment were diverted to other purposes), *with Selby*, 948 A.2d at 138 (finding no liability when payments were made in response to general invoices and funds did not specify for which aspect of the project payment was sought).

There is a genuine dispute over whether Zimmerman knowingly retained or used the trust fund moneys for other purposes. Zimmerman signed over 600 checks from the bank account in which the trust funds were deposited, many of which were for other purposes than to pay subcontractors or suppliers of the Project. *See* Argonaut Resp. at 13-14. Argonaut also alleges that Zimmerman had knowledge of Wolverine's money flow based on his review of its financial statements. *Id.* at 15. Because a reasonable jury could conclude that Zimmerman knowingly diverted trust fund money, Zimmerman is not entitled to summary judgment on this basis.

Zimmerman further argues that he is entitled to summary judgment because Argonaut's claim is based on its subrogation to the claims of Wolverine's subcontractors and the balance of equities weigh in Zimmerman's favor. Zimmerman Mot.at 14. Argonaut contends that it has an independent claim under the MTFS, and alternatively, that it has a right of conventional subrogation to the subcontractors' claims and the equities weigh in favor of Argonaut. Argonaut Resp. at 4, 7.

Maryland's Construction Fund Trust Statute, Md. Code Ann., Real Property § 9-202, provides that any officer, director, or managing agent of a contractor who knowingly retains or uses trust money for other purposes "shall be personally liable to *any person* damaged by the action." (emphasis added). The MTFS

does not limit the right to assert an action for personal liability to subcontractors or suppliers, but instead allows any person damaged by the misuse of trust funds to bring suit.[28] Because Argonaut asserts that it was forced to pay subcontractors as a result of Zimmerman's failure to properly utilize trust funds, Argonaut can bring suit under the statute as a person damaged by the misuse of funds.[29] Accordingly, Zimmerman's cross-motion for summary judgment will be denied.

III. Conclusion

For the reasons stated above, Argonaut's motion for summary judgment against Wolverine will be granted. Argonaut's motion for summary judgment against Zimmerman will be denied. Robert Zimmerman's cross-motion for partial summary judgment will be denied.

_9/12/13_
Date

_William D. Quarles, Jr._
William D. Quarles, Jr.
United States District Judge

---

[28] *See Walter*, 951 A.2d at 98 (allowing general contractor to bring claim under Maryland Construction Trust Fund Statute against subcontractor for misuse of funds).

[29] Because Argonaut can assert an independent claim under the MTFS, it is not necessary to balance equities in considering whether Argonaut alternatively has the right to conventional subrogation to the subcontractors' claims under the statute.